<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                   UNITED STATES COURT OF APPEALS
                        FOR THE FIRST CIRCUIT

No. 98-1612

                      UNITED STATES OF AMERICA,

                              Appellee,

                                 v.

           YAMIL H. KOURI-PEREZ, a/k/a SEALED DEFENDANT 1,

                        Defendant, Appellant.

                                             

No. 98-1663

                      UNITED STATES OF AMERICA,

                              Appellee,

                                 v.

                    YAMIL H. KOURI-PEREZ, ET AL.,

                       Defendants, Appellants,

                                        

                    JOAQUIN MONSERRATE-MATIENZO,

                             Appellant.

                                             

            APPEALS FROM THE UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF PUERTO RICO

           [Hon. Jose Antonio Fust, U.S. District Judge]

                                             

                               Before

                        Selya, Circuit Judge,

               Coffin and Cyr, Senior Circuit Judges.

                                             
    Martin G. Weinberg, with whom Osteri, Weinberg & Lawson, Kimberly
Homan and Sheketoff & Homan were on brief for appellants Cerezo, et al.
    Gerardo Ortiz-Del Rivero and David W. Roman, with whom Monserrate
Law Office was on brief for appellant Monserrate-Matienzo.
    Jorge E. Vega-Pacheco, Assistant United States Attorney, with whom
Guillermo Gil, United States Attorney, Mara Domnguez-Victoriano,
Assistant United States Attorney, Camille Vlez-Riv, Assistant United
States Attorney, and Nelson Prez-Sosa, Assistant United States
Attorney, were on brief for appellee.

                                             

                             May 7, 1999
                                             

         CYR, Senior Circuit Judge.  Defense counsel appeal the
sanction imposed upon them below for filing a vexatious discovery
request.  We dismiss for lack of appellate jurisdiction.
                               I
                           BACKGROUND
         Appellants' clients were indicted in 1997 for theft of
federal property and money laundering.  Dealings between the
prosecution and defense teams were acrimonious from the start.   For
present purposes, we focus upon the skirmish which began when
Assistant United States Attorney ("AUSA") Maria Dominguez informed
the court that she had reason to believe that one defendant had
paid the retainer for codefendants' counsel.  The defense then
charged that AUSA Dominiguez had violated the Sixth Amendment by
deliberately infiltrating the defense camp.
         Although the district court ultimately found no evidence
for the infiltration theory advanced by the defense, it entered a
civility order "remind[ing] [counsel] that civility in litigation
is a value that this court will protect and enforce[,]" and
directed both sides thenceforth to refrain from "[d]isparaging
personal remarks or acrimonious conduct."   
         Round two began in March 1998, when  AUSA Dominguez
submitted a Brady report which disclosed that during March 1997 the
prosecution had interviewed a Dr. Joaquin Perez-Mendez in the
Dominican Republic and that Dr. Perez possessed information
favorable to the defense but refused to be deposed in Puerto Rico.  
Appellants then sought to depose Perez at the United States Embassy
in the Dominican Republic.  Absent opposition by the government,
the district court granted their motion.
         Appellants submitted a second motion one month later, for
permission to depose Dr. Perez at his own office, rather than the
United States Embassy.  The motion represented that AUSA Dominguez
had telephoned Dr. Perez's spouse, and told her that her husband
would go to prison unless he cooperated with the government.  
Further, appellants reported that Dr. Perez was fearful of
confronting AUSA Dominiguez at the United States Embassy, because
her "true [sur]name" was Leon-Trujillo, and she was the
granddaughter of the former Dominican Republic dictator, Rafael
Trujillo, by whom Dr. Perez's father had been confined as a
political prisoner.  The allegations in appellants' second motion
were broadcast by the media.
         AUSA Dominiguez promptly denied any improper threats
against Dr. Perez or his spouse and moved for sanctions against
appellants.  She objected to any implication that she used the
surname Dominguez to conceal her ancestry, noting that she had been
legally adopted in Florida as an infant.  She questioned
appellants' failure to contact her before filing their second
motion to change the location of the deposition, particularly since
the government never objected to appellants' unilateral choice of
location.  Finally, she contended that the only conceivable purpose
served by the second motion was to harass or humiliate her, in
direct violation of the civility order.  
         The district court issued a show-cause order, which
appellants claimed violated due process because it failed to
provide adequate notice of the precise bases upon which the court
was considering the imposition of sanctions.  Appellants suggested
in addition that their duty to represent their clients required
that the basis for Dr. Perez's subjective fears be reported, in
order that the merits of their motion might be cogently assessed by
the district court, even if those fears appeared irrational or
baseless.
         In due course the district court accepted AUSA
Dominiguez's characterization of appellants' motives, and imposed
a $4,000 sanction against appellants for violating its civility
order and to deter any future noncompliance.  The court expressly
stated that it was not imposing the sanction pursuant to its
criminal or civil contempt powers, but under 28 U.S.C.  1927 or
its inherent powers, with the warning that any future violation
"may result in criminal contempt under [Federal Rule of Criminal
Procedure] 42."  The court directed appellants to pay the $4,000
sanction within ten days, under penalty of civil contempt.  
Appellants complied, then initiated their interlocutory appeals.  
In the meantime, the case proceeded to trial.
                               II
                           DISCUSSION
         First, we must determine our jurisdiction.  See Petralia
v. AT&T Global Info. Solutions Co., 114 F.3d 352, 353-54 (1st Cir.
1997); In re Licht & Semenoff, 796 F.2d 564, 569-70 (1st Cir. 1986)
(noting the "regrettable" fact that many interlocutory appeals from
attorney-sanction orders have been entertained without considering
appellate jurisdiction).  Normally, appellate jurisdiction depends
upon the existence of a "final judgment," see 28 U.S.C.  1291,
that conclusively "disposes of all the rights of all the parties to
an action," Licht, 796 F.2d at 569, "leav[ing] nothing for the
[trial] court to do but execute the judgment," Quackenbush v.
Allstate Ins. Co., 517 U.S. 706, 709 (1996) (citation omitted).  
Thus, the "final judgment" rule minimizes  dilatory, piecemeal
litigation, and promotes judicial efficiency.  See Licht, 796 F.2d
at 569 (citing Firestone Tire & Rubber Co. v. Risjord, 449 U.S.
368, 374 (1981)).  
         Where its salutary effects are outweighed by other
practical considerations, however, limited exceptions to the final
judgment rule are recognized.  For example, the Cohen (or
"collateral order") exception enables an interlocutory appeal from
an otherwise non-"final" order which meets four conditions.  Cohen
v. Beneficial Indus. Loan Corp., 337 U.S. 541 (1949).  The order
must (1) concern a collateral issue so conceptually distinct from
other issues being litigated in the underlying action that an
immediate appeal would neither disrupt the main action, nor
threaten to deprive the appellate court of useful context which
might be derived from subsequent developments in the litigation;
(2) completely and conclusively resolve the collateral issue; (3)
infringe rights which appellant could not effectively vindicate in
an appeal after final judgment in the case; and (4) involve an
important or unsettled legal issue, rather than merely challenge
discretionary trial court rulings.  See Licht, 796 F.2d at 570-71
(citing Cohen); United States v. Kane, 955 F.2d 110, 111 (1st Cir.
1992) (reformulating these same Cohen criteria into a three-part
test).
         On the question whether monetary sanctions against
attorneys are "final," either under section 1291 or Cohen, the
courts of appeals remain divided.  See Chaves v. M/V Medina Star,
47 F.3d 153, 155 n.7 (5th Cir. 1995) (outlining circuit split);
compare, e.g., Frazier v. Cast, 771 F.2d 259, 261-62 (7th Cir.
1985) (permitting interlocutory appeal); Cheng v. GAF Corp., 713
F.2d 886, 888-90 (2d Cir. 1983) (same), with Click v. Abilene Nat'l
Bank, 822 F.2d 544, 545 (5th Cir. 1987) (dismissing interlocutory
appeal); Eastern Maico Distribs., Inc. v. Maico-Fahrzeugfabrik, 658
F.2d 944, 950-51 (3d Cir. 1981) (same).
         In siding with the latter authorities some time ago we
held that a discovery sanction against a law firm pursuant to
Federal Rule of Civil Procedure 26(g) meets neither the section
1291 nor the Cohen finality requirements.  See Licht, 796 F.2d at
569-73 (dismissing law firm's interlocutory appeal).  Rule 26(g)
forbids the interposition of a discovery request by counsel "for
any improper purpose, such as to harass," Fed. R. Civ. P. 26(g);
see Licht, 796 F.2d at 567 (noting that district court expressly
found that attorneys' "primary purpose in deposing [witnesses] was
to harass"), and empowers the court to impose an "appropriate
sanction" for its violation.  Since we are bound by First Circuit
precedent closely on point, see Institut Pasteur v. Cambridge
Biotech Corp., 104 F.3d 489, 493 n.8 (1st Cir. 1997), appellants
face an uphill battle given the clear parallels between Licht and
the present case.
         Notwithstanding the statements to the contrary by the
district court, appellants insist that the challenged sanction
issued pursuant to its statutory power to punish counsel for
criminal contempt.  See 18 U.S.C.  401; In re Power Recovery Sys.,
Inc. (Eck v. Dodge Chem. Co.), 950 F.2d 798, 802 (1st Cir. 1991)
(in distinguishing between criminal and civil contempt, appellate
court must go beyond mere labels, and assess substantive attributes
and aims of sanction).  Were we to adopt their approach, appellants
would achieve two distinct advantages.  First, by mischaracterizing
the district court sanction as a criminal-contempt order, from
which an interlocutory appeal would lie, appellants circumvent the
customary barrier to interlocutory appeals from civil-contempt
orders.  See Licht, 796 F.2d at 568.  Second, in so doing
appellants would prevail on the merits since the district court did
not purport to conform its order with the heightened procedural
requirements attending criminal-contempt adjudications.  See Fed.
R. Crim. P. 42; see also, e.g., Hicks v. Feiock, 485 U.S. 624, 632-
33 (1988) (criminal contempt must be proven "beyond a reasonable
doubt"); Power Recovery, 950 F.2d at 802 n.18.
         Appellants argue that the sanction order essentially
bears the attributes of a criminal contempt, rather than a civil
contempt.  By apportioning the entire universe of district court
sanctions into but two categories, however, appellants
impermissibly presume that any sanction that does not proceed from
the district court's civil-contempt power necessarily proceeds from
its criminal-contempt power.  As Licht itself establishes, the
dichotomy proposed by appellants is demonstrably mistaken.  
Instead, the pertinent distinction in the present context is
between punitive contempt sanctions and punitive non-contempt
sanctions.
         The challenged sanction is expressly predicated on the
"inherent powers" of the federal district courts.  Article III
courts were imbued with an array of "inherent powers" in performing
their case-management function from the moment of their
establishment, powers never specifically enumerated in the
Constitution or in legislative enactments, yet "necessary to the
exercise of all other[] [enumerated judicial powers]."  United
States v. Horn, 29 F.3d 754, 759 (1st Cir. 1994) (citing United
States v. Hudson, 11 U.S. (7 Cranch) 32, 34 (1812)); see also
Chambers v. NASCO, Inc., 501 U.S. 32, 43-44 (1991); Link v. Wabash
R.R. Co., 370 U.S. 626, 630-31 (1962).  These implicit powers
include the judicial authority to sanction counsel for litigation
abuses which threaten to impugn the district court's integrity or
disrupt its efficient management of the proceedings.  See Chambers,
501 U.S. at 43 (noting that inherent district court powers include
authority to "control admission to its bar and to discipline
attorneys who appear before it"); Roadway Express, Inc. v. Piper,
447 U.S. 752, 766 (1980) ("The power of a court over members of its
bar is at least as great as its authority over litigants.").  
Moreover, its criminal contempt power over counsel inheres in the
district court's inherent or its so-called supervisory power.  See
In re Terry, 128 U.S. 289, 302-03 (1888); Horn, 29 F.3d at 765 n.13
("[C]ontempt originated as an aspect of the supervisory power.").  
In time, some of these inherent powers were made explicit, either
by enactment or the promulgation of procedural, disciplinary or
ethical rules.
         Thus, Congress enacted 28 U.S.C.  401, which codified
the district court's implicit power to hold litigants in criminal
contempt.  See also 28 U.S.C.  1927 (authorizing imposition of
"excess costs" upon counsel who "unreasonably and vexatiously"
multiply proceedings). Further, the Federal Rules of Civil
Procedure include provisions empowering district courts to punish
counsel for various pleading and discovery abuses.  See, e.g., Fed.
R. Civ. P. 11 (imposing sanction on counsel who signs pleading or
motion intended "for any improper purpose, such as to harass");
Chambers, 501 U.S. at 42 n.8 (listing procedural rules prescribing
attorney sanctions).  In each instance, the sanctions are punitive
in nature, see Horn, 29 F.3d at 765 n.13 ("[C]ontempt . . .
continues to serve essentially 'the same purpose' as do sanctions
imposed under the supervisory power.") (citation omitted), in that
the court intends to penalize counsel for an earlier failure to
conform to some threshold of professional conduct imposed by court
order, statute or rule.  See, e.g., Peterson v. BMI Refractories,
124 F.3d 1386, 1395 (11th Cir. 1997) (noting that 28 U.S.C.  1927
is "penal in nature"); Cooper v. Salomon Bros., 1 F.3d 82, 85 (2d
Cir. 1993) ("Rule 11 sanctions are often punitive or aimed at
deterrence."); Hamilton v. Ford Motor Co., 636 F.2d 745, 747 (D.C.
Cir. 1980) ("The principal purpose of Rule 37(b) is punitive, not
compensatory.").
         The federal district courts nonetheless retain their
inherent power to impose sanctions unless its exercise directly
conflicts with subsequently promulgated rules or enactments.  See
Chambers, 501 U.S. at 46, 50 ("[T]he court ordinarily should rely
on the Rules rather than the inherent power . . . [b]ut if in the
informed discretion of the court, neither the statute nor the Rules
are up to the task, the court may safely rely on its inherent
power[s]," which "must continue to exist to fill in the
interstices."); Mark Indus. v. Sea Captain's Choice, Inc., 50 F.3d
730, 733 (9th Cir. 1995); cf. John's Insulation, Inc. v. L. Addison
and Assocs., Inc., 156 F.3d 101, 108 (1st Cir. 1998) (courts
invoking inherent powers may be guided by analogy to the Rules).  
Thus, to say that the sanctions imposed below are punitive in
nature is not to suggest that they are tantamount to de facto
criminal contempt adjudications.
         In considering appropriate sanctions for attorney
misconduct, the district court has an array of options, ranging
from criminal contempt to non-contempt measures.  See Eash v.
Riggins Trucking, Inc., 757 F.2d 557, 564 (3d Cir. 1985) (en banc)
(noting that district judges have "a wide range of tools to promote
efficiency in their courtrooms").  Frequently, there will be sound
grounds for not invoking the court's criminal-contempt power,
especially since its potency necessitates that it be used "with
restraint and discretion." Chambers, 501 U.S. at 44; see Whitney
Bros. Co. v. Sprafkin, 60 F.3d 8, 13 (1st Cir. 1995).  Therefore,
normally there is much to be said for deploying the least extreme
sanction reasonably calculated to achieve the appropriate punitive
and deterrent purposes.  See In re Oliver, 333 U.S. 257, 274 (1948)
(contempt powers require the "least possible power adequate to the
end proposed") (citation omitted); Horn, 29 F.3d at 760 ("[I]t is
inappropriate for courts to attempt to use [inherent powers] to
justify an extreme remedy when, short of such heroic measures, the
means are at hand to construct a satisfactory anodyne more narrowly
tailored to the objective."); Schmid v. Milwaukee Elec. Tool Corp.,
13 F.3d 76, 79 (3rd Cir. 1994).
         Thus, the criminal contempt power is to be reserved for
conduct that bespeaks a criminal mens rea (i.e., intentional or
reckless conduct) and has been proven beyond a reasonable doubt,
whereas non-contempt sanctions normally suffice in circumstances
involving less culpable states of mind.  See Chambers, 501 U.S. at
47 (noting that Rule 11 sanctions may be imposed even where
attorney conduct falls short of "reasonableness" standard); Cruz v.
Savage, 896 F.2d 626, 631-32 (1st Cir. 1990) (same); see also
United States v. Claros, 17 F.3d 1041, 1047 n.4 (7th Cir. 1994)
(Rule 11 . . . impos[es] a negligence standard," and Rule 37
violations are sanctionable even where attorney did not act in "bad
faith"); Harlan v. Lewis, 982 F.2d 1255, 1260 (8th Cir. 1993)
(noting, in dicta, that "inherent powers" sanction may be imposed
for ethical-rule violations absent "bad faith" on part of counsel).
         Although the "label" employed by the district court is
not necessarily determinative in distinguishing criminal and civil
contempt, see Power Recovery, 950 F.2d at 802, often it is
significant indeed in distinguishing criminal contempt
adjudications from non-contempt punitive sanctions.  A formal
judicial finding of "contempt" connotes the highest level of
censure against counsel.  See In re Kave, 760 F.2d 343, 349 (1st
Cir. 1985) (reviewing for contempt where master expressly held that
counsel was "contemptuous of [the] Court."); Buffington v.
Baltimore County, Md., 913 F.2d 113, 132-35 (4th Cir. 1990) (en
banc) (vacating punitive fine, where district court expressly held
counsel in "contempt" for discovery abuses, but affirming "civil"
sanction imposed pursuant to inherent powers); cf. In re Williams,
156 F.3d 86, 89-90 (1st Cir. 1998) (noting that bankruptcy court
"findings" criticizing counsel's performance were not equivalent to
a sanction or officially designated reprimand), cert. denied, 119
S. Ct. 905 (1999).
         Thus, we reject the contention that the sanction imposed
against appellants necessarily amounted to an adjudication of
criminal contempt simply because it was not a civil contempt
sanction.  See Chambers, 501 U.S. at 46 ("The imposition of
[inherent-power] sanctions . . . vindicat[es] judicial authority
without resort to the more drastic sanctions available for
contempt.") (emphasis added; citation omitted); In re Sutter, 543
F.2d 1030, 1037-38 (2d Cir. 1976) (same); see generally Comment,
Financial Penalties Imposed Directly Against Attorneys in
Litigation Without Resort to the Contempt Power, 26 UCLA L. Rev.
855 (1979) (collecting cases).  Quite the contrary, the district
court explicitly disclaimed any intention to hold appellants in
contempt, instead imposing a non-contempt, "inherent powers"
sanction for their harassment of opposing counsel, akin to the
sanction in Licht.  Consequently, appellants must distinguish their
non-contempt sanction from that imposed in Licht.  See Institut
Pasteur, 104 F.3d at 493 n.8.
         First, appellants suggest that Licht should govern only
if the underlying proceeding is civil, as distinguished from
criminal.  We do not agree.  Federal district courts not only
exercise their inherent power to impose sanctions in both civil and
criminal cases, see Claros, 17 F.3d at 1042, but their contempt
powers "developed most robustly in the area of criminal procedure,"  
see Horn, 29 F.3d at 759, where the codified rules leave more
interstices.  And, of course, interlocutory appeals in criminal
cases are the exception.  See, e.g., Kane, 955 F.2d at 111 (noting
Supreme Court authority restricting Cohen appeals in criminal cases
to three narrow categories:  refusals to dismiss indictments for
violations of double jeopardy clause or speech and debate clause or
to reduce bail); D&H Marketers, Inc. v. Freedom Oil & Gas, Inc.,
744 F.2d 1443, 1445 (10th Cir. 1984).  Were it otherwise, trial
counsel would be diverted from their primary responsibility   their
clients' upcoming trials   while pursuing their own interlocutory
appeals.  Such distractions are even less appropriate in criminal
cases than in civil actions.  See Kane, 955 F.2d at 110 ("As a
result of the 'compelling interest in prompt trials,' the
requirements of the collateral order doctrine have been interpreted
'with the utmost strictness' in criminal prosecutions.") (citation
omitted).
         Next, appellants observe that the Licht sanction issue
was not entirely separable from other matters to be litigated in
the main action.  Thus, should the evidence sought during discovery
in Licht have proven irrelevant to any issue litigated at trial,
counsel's discovery-related conduct would not have supported the
monetary sanctions imposed.  Cf. Licht, 796 F.2d at 572 (noting
that delayed appeal would allow appellate court to view case as a
whole).  In contrast, appellants argue, no valuable insights can be
gained by postponing the present appeal until final judgment, since
the propriety of their conduct vel non cannot be elucidated by
developments at trial.
         We do not share their confidence that no relevant
insights lie in store.  In resisting these sanctions below,
appellants maintained that their reports of the factual grounds for
Dr. Perez's subjective fears about AUSA Dominguez were made in good
faith, even assuming that Dr. Perez's anxieties were irrational or
ill-founded.  Nevertheless, the district court noted countervailing
evidence   such as  appellants' failure to request AUSA Dominguez's
prior consent to relocate the deposition, and their failure to
submit an affidavit from Dr. Perez at the "show cause" hearing   
which could support an inference that appellants' excuse was
presented in bad faith and for the sole purpose of harassing and
humiliating AUSA Dominguez.  Cf. id. at 570 ("The district court's
sanction order was directed at the [law] firm's conduct of
discovery and purpose for undertaking it.") (emphasis added).  
Thus, we cannot say that it is beyond the realm of possibility that
a full trial record may afford important insights into appellants'
actual motives, and, at the very least, permit a better informed
appellate assessment as to whether appellants continued to engage
in a discernible pattern of harassment.
         Appellants next contend that the district court announced
its intention never to reconsider its sanction, thus satisfying the
second   "conclusiveness"   criterion under Cohen.  Although the
district court did decline immediate reconsideration of its
sanction, there is no barrier to a future reconsideration.  
Moreover, in Licht we simply observed that "the sanction may never
be finally imposed."  Id. (emphasis added).  We did not base our
decision on the announced intention by the district court to keep
an open mind, but rather on the well-settled principle that the
district court retains the inherent power to modify or rescind
monetary sanctions at any time, as circumstances warrant.  Id. at
570 ("We are not suggesting that any of these possibilities should
or will be followed in this case, but their existence detracts from
the finality of the order.") (emphasis added).  Finally, the
prospect for canceling the fine may be somewhat better where the
monetary sanction imposed by the court remains in the court
registry.
         Appellants argue that the monetary sanction in Licht
reflected the opposing party's corresponding losses, and therefore
was compensatory, whereas the instant sanction was calculated
solely for its punitive and deterrent effect.  See id. at 567
(sanction made payable to opposing parties).  As already noted,
however, see supra, most non-contempt monetary sanctions    
including the Licht sanction   are at least partially punitive in
purpose, designed to penalize counsel for a discrete violation of
a court order or rule.  See, e.g., Media Duplication Servs., Inc.
v. HDG Software, Inc., 928 F.2d 1228, 1242 (1st Cir. 1991) ("[T]he
focus of any sanction need not be limited to compensation of
opposing counsel."); Mark Indus., 50 F.3d at 733 (refusing to
disturb sanction because "the amount of an inherent powers sanction
is meant to do something very different than provide a substantive
remedy to an aggrieved party . . . [but instead] . . .'vindicat[e]
judicial authority'").  Thus, their punitive nature does not
convert these sanctions into criminal-contempt fines, see supra,
nor meaningfully affect the Cohen calculus, given that the payee's
identity lends no increased urgency to appellants' interlocutory
challenge.
         Appellants complain also that their sanction was made
immediately payable, unlike the sanction in Licht.  See Forgay v.
Conrad, 47 U.S. (6 How.) 201 (1848).  This thrust fails as well.  
First, Licht did not indicate whether or not the Rule 26 sanction
was immediately payable, nor suggest in any way that it would be
material to appellate jurisdiction.  Further, appellants vastly
overstate the Forgay "practical finality" doctrine, which merely
permits interlocutory appeals from "immediate payment" orders which
threaten a special risk of harm to the appellant.   See, e.g.,
Schaffer v. Iron Cloud, Inc., 865 F.2d 690, 691-92 (5th Cir. 1989)
(dismissing interlocutory appeal of sanction order, even though
court directed immediate payment); Eastern Maico, 658 F.2d at 948
(dismissing interlocutory appeal, and noting that normal risks
attending immediate payment cannot satisfy Cohen's third prong
since "the same risk is present to some degree in almost every
order for sanctions where execution precedes review").  Thus, for
example, appellants would need to establish financial inability to
pay the fine, or that the party to whom the payment must be made is
in so precarious a financial condition that it may be impossible to
recover the payment should the sanction order be reversed on final
appeal.  See Cleveland Hair Clinic, Inc. v. Puig, 104 F.3d 123, 126
(7th Cir. 1997); Ortho Pharm. Corp. v. Sona Distribs., 847 F.2d
1512, 1516 (11th Cir. 1988); ODC Communications Corp. v. Wenruth
Invs., 826 F.2d 509, 513-14 (7th Cir. 1987); In re Stable Mews
Assocs. (Stable Mews Assocs. v. Togut), 778 F.2d 121, 124 (2d Cir.
1985).
         These appellants, all practicing attorneys, collectively
remitted the $4,000 fine to the district court prior to their
appeal, and do not suggest that their remittance has caused undue
financial hardship.  See Robinson v. Tanner, 798 F.2d 1378, 1381-82
(11th Cir. 1986) (no appeal permitted where appellant did not
allege that he was financially unable to make immediate payment of
monetary sanction); Ortho Pharm., 847 F.2d at 1515-16 (noting that
size of sanction   $35,000   could be material to whether appellant
would suffer significant liquidity problems).  Furthermore, as the
fine was paid into the court, see supra note 5, rather than to an
opposing party, appellants need fear no dissipation of the monies
pending final appeal.
         Appellants reserve their most fervent arguments for the
third prong in the Cohen analysis, which requires them to
demonstrate irreparable harm in the event their appeals were
delayed until final judgment.  Three distinct harms are identified:  
(1) the significant professional stigma attending the allegedly
unjustified public reprimand delivered by the district court; (2)
the untested civility order, if allowed to remain in place pending
final judgment, would intimidate them into less vigorous advocacy,
thus depriving their clients of their constitutional entitlement to
the effective assistance of counsel; and (3) eventually they may be
placed in a conflict of interest with their clients, who may not be
interested in pursuing an appeal from a final judgment in the
criminal case (e.g., an acquittal).
         The "irreparable harm" prong is the most crucial among
the four Cohen criteria, and frequently proves fatal to appellants.  
See Licht, 796 F.2d at 571.  Clearly, "irreparable harm"
contemplates much more than that an appellant possess reasons for
preferring immediate appellate review, or deem it more convenient
or exonerative.  Rather, an appellant must demonstrate that "denial
of an immediate appeal would make effective [appellate] review
'impossible,' or would 'destroy' the 'legal and practical value' of
the appellant's right to appeal."  Id. (emphasis added) (quoting
Firestone Tire, 449 U.S. at 376-77); see United States v. Ryan, 402
U.S. 530, 533 (1971).  Normally, even the prospect that pretrial
error might necessitate a retrial is insufficient to establish
irreparable harm.  See D&H Marketers, 744 F.2d at 1445 ("Mere error
in the [sanction] order does not satisfy the requirement that the
order be effectively unreviewable on [a final] appeal.") (citing
Firestone Tire, 449 U.S. at 378).  Given its demanding regimen,
appellants cannot distinguish Licht.
         A risk of professional stigma surely attends most
sanction orders, since sanction either explicitly or implicitly
impugns counsel's professional ethics or competence.  After all,
trial counsel are not sanctioned for exemplary conduct.  
Accordingly, the Licht sanction inarguably cast counsel in an
unfavorable light, and although one might debate the relative
harshness of a particular obloquy, jurisdictional determinations
cannot be made to turn on such subjective vagaries.
         In our view, moreover, appellants exaggerate the
stigmatizing effect that a sanction has in the interim.  Until a
sanction order becomes "final" (i.e., nonappealable), the public
and the legal profession understand that the trial court considered
counsels' conduct sanctionable, but surely make allowance for the
prospect that the sanction, if erroneous, may be reversed on
appeal.  Cf. Martin v. Brown, 63 F.3d 1252, 1261-62 (3d Cir. 1995)
(noting that professional stigma might satisfy irreparable-harm
prong where attorney was no longer participating in litigation).
         Similarly, we believe the alleged chilling effect the
sanction may have on appellants' advocacy during the interim is not
material to the present analysis.  Notwithstanding the risk of
sanctions, defense counsel are obligated to represent their clients
vigorously, within the bounds of all applicable ethical codes,  
particularly in a criminal case where the stakes may be much
greater than in civil cases.  Cf. Licht, 796 F.2d at 572 (noting
that despite delay in appeal of sanction order, "[t]he firm's
ethical obligation is to its client's best interests"); Chambers,
501 U.S. at 47 n.11 ("[T]here is little risk that courts will
invoke their inherent power 'to chill the advocacy of litigants
attempting to vindicate all other important federal rights.'")
(citation omitted).
         Although it may be difficult on occasion to draw the line
between zealous advocacy and unacceptable courtroom tactics, the
line must be drawn, cf. United States v. International Bhd. of
Teamsters, 948 F.2d 1338, 1343 (2d Cir. 1991) ("Drawing a line
between zealous advocacy and frivolous conduct, Rule 11 provides a
vehicle for sanctioning an attorney."), and the district courts are
better able to draw it in the first instance.  Counsel must
represent their clients' interest within that line, and not beyond
it.  See  Jones v. Winnepesaukee Realty, 990 F.2d 1, 5 (1st Cir.
1993) ("In this age of burgeoning litigation expense and
overcrowded dockets, . . . a busy trial judge should [not] have to
tolerate litigants' repeated efforts to stall a case [or] harass
other participants."); United States v. Cooper, 872 F.2d 1, 3 (1st
Cir. 1989) ("[A]n attorney is not free to say literally anything
and everything imaginable in a courtroom under the pretext of
protecting his client's rights to a fair trial and fair
representation."); Jones v. Continental Corp., 789 F.2d 1225, 1230
(6th Cir. 1986) ("An attorney's ethical obligation of zealous
advocacy . . . does not amount to carte blanche."); D&H Marketers,
744 F.2d at 1446 (noting that disallowing attorneys' interlocutory
appeals has the salutary effect of "reinforcing the [attorneys']
necessary deference to the trial court's broad discretion in
managing cases").
         Upon appeal from a final judgment, of course, sanctioned
counsel may argue with equal vigor that the sanction order
improperly constrained effective advocacy, and if successful, an
adequate remedy would lie.  See Cooper, 872 F.2d at 5 ("Lawyers
using professional care, circumspection and discretion in
exercising that right need not be apprehensive of chastizement
(sic) or penalties for having the advocative courage" to represent
their clients vigorously.).  But though the fact that trial counsel
would have drawn the line differently than the trial judge may be
grist for an appeal, it does not follow that it enables an
interlocutory appeal.  See D&H Marketers, 744 F.2d at 1445.
         Furthermore, as we stated in Licht, we see no reason to
suppose that these appellants cannot effectively challenge the
sanction order following final judgment   no matter the trial
outcome   without risking a conflict of interest with their
clients.  See Licht, 796 F.2d at 572 ("[W]e have found nothing to
convince us that the appeal could be lost in those circumstances.
. . . We see no reason why an attorney should not be allowed to
appeal a sanction order when the main case is terminated without an
appeal.  The sanction order affects the attorney directly and
independently."); see also Sanders Assocs., Inc. v. Summagraphics
Corp., 2 F.3d 394, 398 (Fed. Cir. 1993) (an attorney can appeal
after final judgment "even if there is no appeal by a party with
respect to the merits"); United States v. Wallace, 964 F.2d 1214,
1217 (D.C. Cir. 1992) ("After the rescheduled trial, at which
defendant was acquitted, [sanctioned attorney] moved that the trial
court reconsider its sanction," and then filed appeal) (emphasis
added); cf. Budinich v. Becton Dickinson & Co., 486 U.S. 196, 199-
200 (1988) (noting that attorney-fee awards are separately
appealable from underlying final judgment).
         Most cases, civil as well as criminal, end in a final
judgment of some sort.  Thus, should appellants' clients be
acquitted, or enter a plea, an independent appeal would lie from
the sanction order.  Similarly, should their clients be convicted,
their appeals can proceed in tandem with appellants, thereby
promoting judicial efficiency, an important goal of the "final
judgment" rule.
         Finally, focusing on Cohen's final prong, appellants
argue that their appeal involves very important legal issues, such
as the alleged violation of their right to procedural due process
by the district court.  While we have no doubt that these
constitutional rights are weighty, the reality is that the district
court cannot impose any enforceable sanction, even a Licht-type
sanction, absent compliance with all applicable procedural due
process requirements.  See Chambers, 501 U.S. at 50; Roadway
Express, 447 U.S. at 767; Societe Internationale Pour
Participations Industrielles et Commerciales v. Rogers, 357 U.S.
197, 209 (1958); United States v. 789 Cases of Latex Surgeon
Gloves, 13 F.3d 12, 15 (1st Cir. 1993) ("The '[l]ack of fair notice
is fatal to [the court's] exercise of inherent power.'") (citation
omitted).  Moreover, appellants' argument would permit sanctioned
counsel to evade section 1291 simply by alleging a due-process
violation, thereby rendering Licht a dead letter.  Just as
importantly, appellate courts frequently turn away interlocutory
appeals involving the weightiest constitutional questions unless
the appellant has met the remaining Cohen criteria.  See, e.g.,
Starcher, 144 F.3d at 423 ("The Supreme Court has declined to
extend the [Cohen] collateral-order doctrine to cover appeals from
judgments of even the most sweeping import.").  Thus, if
appellants' due-process rights were violated, there is no reason to
assume they cannot be fully vindicated on final appeal.
                              III
                           CONCLUSION
         We are neither persuaded that the challenged sanction
differs so substantially from the Licht sanction as to warrant
distinctive treatment under either section 1291 or Cohen, nor that
it is beyond the pale in any other respect, cf. Eastern Maico, 658
F.2d at 951 (noting that extraordinary remedies, like petitions for
mandamus, are available to address egregious abuses of discretion
under the district court's inherent powers).  Finally, it is
noteworthy that some courts of appeals which have been more
inclined to entertain these interlocutory appeals have expressed
second thoughts of late.  See, e.g., Lapidus v. Vann, 112 F.3d 91,
96 (2d Cir.) ("Were we writing on a clean slate, we would be
tempted to confine Cheng to its unusual facts and characterize the
sanctions order here as nonappealable under the Cohen doctrine."),
cert. denied, 118 S. Ct. 337 (1997); Cleveland Hair, 104 F.3d at
125 (noting that its prior interlocutory-appeal rulings had "not
played to universal acclaim," and that any extension of those
precedents would result in "a substantial, and unjustified, erosion
of the final-decision requirement").  For our own part,
particularly in the context of a criminal trial we remain loath to
embrace a jurisdictional rule with the ominous implications
discussed above.  See, e.g., D&H Marketers, 744 F.2d at 1446
("[T]he potential exists for repeated sanctions over an extended
period of time, each one of which would result in an immediate
appeal to this court," and hence "the potential for wasting the
appeal court's time.").
         Appeal dismissed; costs to appellee.

</body>

</html>